## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION


**SPECTRUM SUNSHINE STATE, LLC,**

      **Plaintiff,**

**v.**                                   **No. 8:23-CV-01284-WFJ-UAM**

**SOLIVITA COMMUNITY
ASSOCIATION, INC.,**

      **Defendant.**

_____/


## DEFENDANT SOLIVITA COMMUNITY ASSOCIATION, INC.'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

## Table of Contents

Introduction ...................................................................................1

Undisputed Material Facts ................................................................2

    A. In 2014, Bright House and Solivita's developer sign a bulk cable contract. ......................................................................2

    B. Spectrum attempts to negotiate a renewal of the Agreement, then invites Solivita to proceed with an RFP process after negotiations impasse.............................................................2

    C. The Association forms a subcommittee and hires a consultant..............................................................................3

    D. The Association issues an RFP, and after evaluating the proposals, the subcommittee selects and meets with three finalists.................................................................................4

    E. Solivita decides to negotiate with Blue Stream. .....................6

    F. After receiving Blue Stream's offer, Solivita gives Spectrum notice and an opportunity to match the offer.........................8

    G. Spectrum submits an offer, which Solivita considers and finds inferior.....................................................................9

Argument ................................................................................... 13

    I. As a matter of law, Spectrum cannot establish its claims for breach of contract in subparagraphs 39(a)–(d) of Count I...........................13

    A. Spectrum had "immediate written notice of Blue Stream's offer," ¶ 39(a). .................................................................13

    B. The Association did not breach by "entering into a contract with Blue Stream and not with Spectrum," ¶ 39(b). .............14

        1. Section 2 did not create a right of first offer or a right of first refusal. .......................................................................14

        2. Section 2 granted Spectrum a right to receive offers the Association was willing to accept, and a period of time to submit a competing offer. ........................................16

3.  The terms and conditions in Spectrum's offer were neither "equivalent to" Blue Stream's nor "better" for the Association's needs.....................................17

(a)  Differences related to the installation of fiber......................18

(b)  Differences in home equipment ...........................................19

(c)  Differences in costs..............................................................20

(d)  Differences in the performance guarantee............................20

(e)  Additional obligations imposed on the Association..............................................................20

C.  Spectrum has no claim of breach for "[e]ntering into a contract with Blue Stream on terms and conditions different than" the one it received, ¶ 39(c). ........................................21

D.  There was no breach of the duty of good faith and fair dealing, ¶ 39(d). ...................................................................22

II.  Spectrum cannot establish its claim for specific performance in Count II ............................................................................................24

**Conclusion**.................................................................................................**25**

**Introduction**

In this action, Spectrum Sunshine State, LLC (Spectrum), sues its former customer, the Solivita Community Association, Inc. (Association or Solivita), for a determination that new bulk internet and cable terms and conditions it offered were "better" for the Solivita community than those offered by a competitor. That, however, is a decision for the Association—not for Spectrum, and not for the courts.

Spectrum supplied bulk cable to Solivita under a ten-year Bulk Cable Services and Right of Entry Agreement (Agreement). Near the end of the term, the Association formed a subcommittee that examined the community's needs for the future, conducted a Request for Proposal (RFP) process in which Spectrum participated, applied a rigorous ranking and selection criteria, and ultimately recommended Blue Stream Communications, LLC (Blue Stream) as the highest-scoring provider. After negotiating the terms, Blue Stream presented an offer that the Association found acceptable. The Association forwarded the offer to Spectrum with an invitation to "match" "under equivalent or better terms and conditions," as allowed in the Agreement. Rather than agree to Blue Stream's terms and conditions or redline any revisions, Spectrum offered an entirely different contract.

The subcommittee compared the offers, noted substantial differences, and determined Spectrum's offer was not "equivalent or better" than Blue Stream's in several critical areas. Ultimately, the Association executed the Blue Stream contract.

The Agreement did not take away, or even limit, the Association's right to select its next cable provider, and Spectrum adduced no evidence of a capricious

1

exercise of discretion. Spectrum cannot second-guess the Association's decision as to which cable provider offered better terms and conditions for the community's needs.

Accordingly, Solivita moves for partial summary judgment on the alleged breaches of contract in subparagraphs 39(a)–(d) of Count I, and all of Count II.

## Undisputed Material Facts

### A. In 2014, Bright House and Solivita's developer sign a bulk cable contract.

Solivita is a 55-and-older community in Polk County, Florida. Statement of Undisputed Facts (SOF) ¶1. While under control of the developer, the Association entered into the Agreement with Spectrum, then known as Bright House Networks, LLC (Bright House or BHN), for a 10-year period beginning April 17, 2014. SOF ¶¶2-3. Section 2 provides:

> 2. Term; Right of First Offer/Refusal. … If, during the Term and for one (1) year thereafter, Association receives any offer from any third party for the right to provide any Competitive Service at the Property on a bulk billing or exclusive basis, … Association shall provide to BHN immediate written notice of such offer, and for a period of fifteen (15) days after receipt of such notice, BHN shall have the right to match such offer under equivalent or better terms and conditions.

SOF ¶4. Bright House's legal department prepared this "standard," "boiler" provision, and it appears in most Bright House agreements. SOF ¶5. Neither Spectrum nor the Association has knowledge of the parties' intentions surrounding § 2, and both interpret it based on "only what's written in the contract." SOF ¶6.

### B. Spectrum attempts to negotiate a renewal of the Agreement, then invites Solivita to proceed with an RFP process after negotiations impasse.

Spectrum delivered bulk cable services under the Agreement using a "Legacy System" installed in 1999, consisting of coaxial cable (coax) running from "40 or 50"

"nodes" to in-home equipment in the 5,500 homes in Solivita. SOF ¶¶7-9. To upgrade in-home equipment, Spectrum mailed—and required Solivita's residents to self-install—upgraded items such as a TV set-top box, modem, and router. SOF ¶10.

In 2018, Spectrum and the Association (then under developer control) sought to negotiate a renewal of the Agreement, which culminated in a "best and final offer" from Spectrum's Vice President of Sales, Lynn Dodson. SOF ¶11. When the Association explained that it had "no other choice but to put this out to bid with several other providers," Dodson invited the Association to proceed: "We look forward to moving forward when you wrap up the RFP process." SOF ¶¶12-13.

## C. The Association forms a subcommittee and hires a consultant.

In January 2022, the developer turned control of the Association over to the residents under Fla. Stat. § 720.307. SOF ¶14.  By May 2022, the resident-controlled Association formed a subcommittee, which it tasked with "identifying specifically what … [Solivita's] expectations were for a new contract and what provider would do the best job in meeting those needs and meeting … [Solivita's] specific demands." SOF ¶¶15, 17. From the outset, the subcommittee viewed Spectrum as "a good vendor" and felt "this was Spectrum's contract to lose." SOF ¶16.

Realizing "the enormous complexities and countless issues affecting a new contract," the subcommittee concluded it needed to "engag[e] the services of a Bulk Telecom Consultant to better facilitate negotiations with powerhouse cable providers and optimize a contract that favors Solivita." SOF ¶¶20-21. The subcommittee vetted four industry consultants, which the subcommittee and Board interviewed, and the

3

Board ultimately selected Chasen Gill of PropRevs, LLC. SOF ¶22.

The subcommittee sought to "future-proof" Solivita by "ascertain[ing] potential technological upgrades to maximize Solivita bulk services functionality for the foreseeable future." SOF ¶19. In evaluating what "was in the best interest in the community .... for the next ten years," the subcommittee determined "fiber to each home was an absolute," based on its research and the unanimous recommendation of the four consultants. SOF ¶23. The subcommittee demanded fiber—not coax—for several reasons, including "user experience" and "reliability." SOF ¶24.

### D. The Association issues an RFP, and after evaluating the proposals, the subcommittee selects and meets with three finalists.

On October 24, 2022, the Association issued an RFP to service providers with the subcommittee's list of "the specifics that [Solivita] wants," including "a robust fiber-to-the-home solution." SOF ¶¶25-28. In response, five providers, including Spectrum and Blue Stream, submitted proposals. SOF ¶¶29, 31-32. Spectrum did not object to the RFP process and did not request copies of the other proposals. SOF ¶30.

The subcommittee created an "evaluation spreadsheet," with a "detailed level of requirements," to rate providers based on weighted scores. SOF ¶33. The subcommittee assigned the greatest weight to requirements such as "[a]cceptable options available for service activation and equipment installation," "acceptable penalties," and "any gotcha's in the contract." SOF ¶¶33-34.

Using this rating system, the subcommittee had selected three finalists by December 2022: Spectrum, Hotwire, and Blue Stream. SOF ¶35. The subcommittee

"made … clear" to the finalists that it "wanted to know … the equipment that was going to be installed," "the brand," "the model," and "the specifications." SOF ¶36.

Although Gill had "sent regular emails requesting updates," the subcommittee saw a "lack of urgency" from Spectrum and had "difficulty getting Spectrum to the table." SOF ¶40. On January 5, 2023, the subcommittee met with Hotwire. SOF ¶37. On January 13, Blue Stream's CEO made a presentation to the subcommittee. SOF ¶38. Blue Stream's presentation provided "very specific information as to what they were going to install," such as "brand name [and] model" of the equipment, and "demonstrated how the equipment worked." SOF ¶39.

On January 23, Spectrum's Dodson, Monica Sanchez-Ayers, and Ed Torres, met with the subcommittee. SOF ¶48. At the outset, Dodson disputed the price Sanchez-Ayers presented and claimed additional time was needed to calculate a correct price. SOF ¶49. He then "disagreed with [the subcommittee's] decision to install fiber" and "attempted at great length to convince [the subcommittee] to stay with coax." SOF ¶50. He pushed "high split"—"a technology [Spectrum is] currently doing [as] a network upgrade on our … Legacy [coax] network" that allows "the same Internet speed without having to dig up the entire community." SOF ¶¶41-44, 47, 51. High split uses "the existing [coax] wiring within the community," making it significantly cheaper for Spectrum. SOF ¶¶45-46. Dodson "thought [the] end goal was probably Internet speed" because "[t]hat's the reason most people are looking … for symmetrical Internet speeds," and he "wanted to make sure the association … was aware" that Spectrum "could provide symmetrical Internet speeds without doing

a full fiber over-build." SOF ¶52. Internally, Spectrum's communications expressed that "[S]olivita does not make sense" because "this community doesn't really need a fiber overbuild." SOF ¶72. When the subcommittee asked how much Solivita would save with high split, Dodson did not know. SOF ¶55.

Unlike Blue Stream, Spectrum was "very ambiguous" and "unclear as to what equipment it could or would install," and "there was no demonstration whatsoever." SOF ¶56. The subcommittee "made it clear, repeatedly, that we would not accept language assuring us that whatever box [Spectrum] intended to install would be adequate to the task, but that we wanted to know the brand name and model number of whatever they were going to put in place," as other providers had done. SOF ¶57.

The subcommittee informed Spectrum that competing finalists "recommended the TiVo product and that we were impressed with it, [and Dodson] raised the possibility of [Spectrum] providing a … Xumo product." SOF ¶58. Unlike TiVo, which had been on the market for many years, Xumo was a "new streaming device" that was not in use anywhere, that Spectrum was "not demoing at that time," and that Spectrum would not launch to customers until October 2023. SOF ¶¶59-60.

When asked about customer service, Dodson declined to put a representative on-site at Solivita. SOF ¶61.

**E. Solivita decides to negotiate with Blue Stream.**

After meeting with the finalists, the subcommittee updated each board member and "reviewed the details of the various offerings, compared them, explained our thinking, and … why we considered one to be superior to the others

based on the factors that we had laid out to be the most important." SOF ¶62-63. "[S]atisfied with [the subcommittee's] results," the board members approved "inviting Blue Stream to a special Board of Directors Meeting." SOF ¶64. Meanwhile, subcommittee chairman, Bob Monica, gave "at least 20" presentations to inform the community "what [the subcommittee] was doing" and "allow them to ask any questions as to what the goals and objectives were." SOF ¶65.

Although the subcommittee was tasked with recommending a provider, only the "Board ha[d] the authority to approve the final contract." SOF ¶18. On January 31, the Association held a special board meeting and town hall, where Blue Stream gave a presentation, the subcommittee formally recommended Blue Stream, and the Association board voted to negotiate with Blue Stream. SOF ¶66-68.

Unbeknownst to the Association, Dodson and other Spectrum employees viewed a video recording of the town hall meeting and circulated a link, prompting Spectrum to prepare and mail an "educational" flyer to every home in Solivita. SOF ¶69. The flyer offered bulk video and bulk internet services for $50.60 per month—a price Spectrum had not offered the board—and encouraged residents "to reach out directly to the board members." SOF¶ 70. Spectrum then monitored, and internally reported on, the resident "activity on [Solivita's] social media" page. SOF ¶71.

The Association "began negotiating terms with Blue Stream" and exchanging redline drafts. SOF ¶73. The drafts were incomplete, however, because "[t]here were still terms in the agreements that were to be determined[,] had not been agreed upon even, had not been discussed." SOF ¶74.

On March 9, Blue Stream sent an offer the Association deemed acceptable. SOF ¶75. The Association board members referred to the offer as a "bilateral verbal agreement," a term initially used by vice president Dr. Marie Sepe, a former government contract manager, who understood the term to signify "a version that Solivita would be willing to sign" and that Blue Stream "would be willing to sign, bar any typos that were found." SOF ¶75-76.

### F. After receiving Blue Stream's offer, Solivita gives Spectrum notice and an opportunity to match the offer.

A few hours later, on the afternoon of March 9, the Association sent Spectrum notice (dated March 10th) of the offer via overnight mail, enclosing the 47 numbered pages of the draft Blue Stream agreement, with all exhibits and placeholder pages for three attachments. SOF ¶77-78. The three referenced attachments were the "Solivita Requirements," *i.e.*, the RFP (Attachment 1), and "Technical Proposal," *i.e.*, Blue Stream's RFP response (Attachment 2a) and Blue Stream's January 31 town hall presentation (Attachment 2b). SOF ¶79. The Blue Stream agreement stated, "In the event of conflict between the terms of this Agreement and these Attachments, the terms of this Agreement shall control." SOF ¶80.

Spectrum considered the right to receive notice of a competitor's offer that the Association is willing to accept and the right to submit a matching offer "valuable." SOF ¶¶81-82. But Dodson found "[t]he fact [the Association] sent the actual Blue Stream agreement … concerning due to the fact I am not sure of its purpose." SOF ¶84. Dodson asked Gill for "an exact list of deal points that the Board is

considering." SOF ¶85. When Gill told him to "review the entire offer, including terms and conditions" of the Blue Stream agreement, Dodson sent Gill a list of deal points Spectrum "extracted." SOF ¶85. Gill reiterated that "Spectrum review[] the RFP, meeting notes, and other available sources to construct a response." SOF ¶86.

Spectrum did not request the three attachments referenced by the placeholder pages. SOF ¶87. However, Spectrum already had two: Attachment 1 (the RFP) and Attachment 2b (Blue Stream's January 31 town hall presentation, which Spectrum employees reviewed and circulated). SOF ¶88.

### G. Spectrum submits an offer, which Solivita considers and finds inferior.

Blue Stream requested that the Association execute a letter of intent (LOI) and a grant of easement (GOE). SOF ¶89. The Association previously informed Blue Stream about § 2 of the Agreement, and the Association's president, Larry Anson, "reaffirmed" to Blue Stream's CEO "that we [the Association] need to consider any counter proposal by Spectrum before we could go any further." SOF ¶¶90-91. The Association declined to sign the LOI or GOE during the contract negotiations, and instead, only granted Blue Stream a revocable license for "appropriate access to the community to perform preliminary construction detailed work for its own records should [it] be awarded or the board approve" the contract. SOF ¶¶92-93.

On March 24, Spectrum sent the Association its response offer. SOF ¶94. In compiling this offer, Spectrum did not consider anything it learned in the RFP process, believing "[i]t wasn't relevant." SOF ¶95. Instead, Spectrum focused on terms it thought "would be the ones most important to the residents of Solivita"—

based not on Solivita's expressed needs but Spectrum's belief of "what most communities are looking for." SOF ¶96. Spectrum understood "any variation in not meeting or increasing our offer will give [the Association] the ability to move to BlueStream." SOF ¶97. Spectrum picked a price of $58.99 per month ($9 more than its flyer) for a single reason—it was $1 less than Blue Stream's price, and Spectrum believed "all we had to do was beat the Blue Stream offer by a little bit." SOF ¶98.

After seeing the offer, subcommittee member Scott Vinkemulder sent an email noting a "complete lack of information on the DVR device;" "[s]elf-installation of all CPE [customer premises equipment]," consistent with "the traditional customer experience we have seen from Spectrum;" "list[ing] CPE as a modem," which "is with coax," rather than "an ONT [which] is used for fiber;" and "2 Gig symmetrical internet is a red herring" because "99.9% of residents currently couldn't use 1 gig, so 2 gig is an easy offer that isn't relevant to the user experience and because it won't be used, wouldn't be a burden on the Spectrum network." SOF ¶100.

The next day, Association vice president Sepe sent an email, pointing to numerous other "issues," including an incorrect statement about "rate freeze for 2 years" in Spectrum's cover letter; "very vague" provisions with "no performance metrics and absolutely no teeth;" and § 3.1 of the System Installation and Services Attachment gives Spectrum "the ability to back out of installing Fiber due to their judgment that it wouldn't be commercially reasonable." SOF ¶101.

To the subcommittee, it was "obvious" from "even a cursory reading" that Spectrum's offer "did not match in many ways." SOF ¶99. For example:

| BLUE STREAM | SPECTRUM |
|---|---|
| No comparable provision. | If Operator determines, in its sole discretion, that it would not be commercially sensible to install the System (due to technical issues, costs, Laws, etc.), then Operator will discuss such situation with Owner and the parties shall resolve such situation. |
| Beginning on the Effective Date, BLUE STREAM will provide a bulk rate … of <u>$59.95</u> per unit per month ***inclusive of all fees and surcharges*** (exclusive of all applicable governmental taxes and fees actually paid to a governmental entity). | The '<u>Bulk Service Fee</u>' is $58.99 per Unit x 5,473 Units = $322,852.27 per month (plus applicable governmental taxes and fees payable to a government entity) for the Services provided on a bulk-billed basis as described below. |
| [§ 4.C.8] In-Unit Equipment: All in-unit ONTs shall be 'Calix GP1101X 10Gig' and all in-unit mesh networking equipment shall be 'Plume Superpod,' …<br><br>[§ 6.A.] BLUE STREAM will provide Cable Television Services … which shall include:<br><br>1. Digital Core (*see* Exhibit B … );<br>2. Two (2) TiVo set-top-boxes;<br>3. Network DVR with storage for up to 200 hours of recording per unit;<br>4. ONT to support Services;<br>5. Wireless mesh pod network devices sufficient provide a wireless signal as described in Section 4.C.7., and<br>6. HD Video Service. | [§ 3.6] The type of CPE [customer premises equipment] provided to Users ***shall be in Operator's sole discretion and subject to availability and change at any time without notice***…<br><br>[§ 4.8] The Bulk Service Fee includes 2 IP enabled digital set-top boxes per Unit. The set-top box is DVR enabled and includes Cloud DVR service.<br><br>[§ 4.10] The Bulk Service Fee includes one modem, one wireless router and one Wi-Fi mesh pod per Unit. |
| [§ 2.A.] BLUE STREAM shall… install… the System in good working condition at the Community at its own expense.<br><br>[§ 4.A.] BLUE STREAM agrees to provide all labor, materials and equipment needed to… install… the System…<br><br>[§ 5.C.2] Unit installation of Services must be completed within seven (7) business days after request … | [§ 4.8] <u>Bulk Video Service CPE</u>.… User is required to self-install this CPE … Users may request … professional CPE installation directly from Operator, and, if available, will be provided per Operator's then-current terms and conditions.<br><br>[§ 4.10] <u>Bulk Internet Service CPE</u>.… User is required to self-install this CPE … Users may request … professional CPE installation directly from Operator, and, if available, will be provided per Operator's then-current terms and conditions. |

11

| BLUE STREAM | SPECTRUM |
|---|---|
| In the event that BLUE STREAM has not completed the installation of the System and is not offering Services to each Unit by April 17, 2024, … BLUE STREAM shall pay directly to the un-activated Unit owners who have not yet been offered the Services, directly the difference between the bulk rate that the Community pays to its current provider for its current bulk services and the retail rate for those services per Unit… | No penalty provision. |

SOF ¶¶104-112, 118-122 (bold, italics added; for a list of more than 50 differences, see Defendant's first and supplemental interrogatory responses, noted in SOF ¶99).

The subcommittee "discussed the Spectrum match or beat offer" and determined it "has too many unspecified items in it," including, "Set Top Box (brand not mentioned), residents must install, no mention of 72 hour recall." SOF ¶102. The subcommittee also considered customer service ratings, including Google (Blue Stream's 4.1/5 stars, Spectrum's 1.2/5 stars) and Net Promoter Score (Blue Stream's "EXCELLENT" rating of +52, Spectrum's "POOR" rating of -4). SOF ¶103.

On March 29, the board held a town hall meeting attended by "between 4- and 500 residents," where the subcommittee explained "[a]ll the elements, [to] make sure people understood where we had started, where we were… [and] why we were recommending that we stay with Blue Stream rather than accept a counter proposal from Spectrum." SOF ¶125.

The next day, Dodson left Gill a voicemail offering—for the first time—to arrange a Xumo demonstration when "he would be in town next week." SOF ¶126. But Spectrum had been aware since February 9, 2023, that its "inability to demo

Xumo at Solivita hurt us big time," and the "timing [of a demonstration] will be critical if Solivita agrees to grant [us] a 2nd chance." SOF ¶127. The Association declined the invitation, as it was too "late" in the process. SOF ¶128.

The board voted to accept the Blue Stream offer and executed the agreement with Blue Stream on April 3, 2023. SOF ¶129.

## Argument

### I. As a matter of law, Spectrum cannot establish its claims for breach of contract in subparagraphs 39(a)–(d) of Count I.

#### A. Spectrum had "immediate written notice of Blue Stream's offer," ¶ 39(a).

The Association agreed to provide "immediate written notice" of any third-party "offer" so Spectrum could "have the right to match such offer...." § 2. An "offer," in this context, means "a display of willingness to enter into a contract on specified terms, made in a way that would lead a reasonable person to understand that an acceptance, having been sought, would result in a binding contract." *Offer*, BLACK'S LAW DICTIONARY 1253 (10th ed. 2014).

When the Association sent out a request for proposal, the responses it received were just that—proposals—which contemplated further negotiations before arriving at a written, binding contract. The Association's RFP clarified it "does not constitute a commitment on the part of Solivita...." P.E. 43 at 1. And Blue Stream's response specified "[t]his preliminary offer is subject to change," "[n]o proposal or draft agreement is final until duly executed by all Parties," and "[s]ervice terms and conditions" are "subject to an executable agreement with the Association." P.E. 16

at 50. Spectrum's proposal conveyed the same "express understanding"—it was neither an offer nor an acceptance, and further negotiations were needed before forming a binding contract. SOF ¶31. Consistent with that understanding, Spectrum never requested any competitor's response during the RFP process. SOF ¶30.

The fully-negotiated draft Blue Stream agreement was the only "offer" the Association received that "would result in a binding contract" upon acceptance. BLACK'S. And the undisputed evidence shows the Association sent a copy to Spectrum that same day. SOF ¶77. Spectrum has no evidence of any "offer" the Association did not "immediately" forward to Spectrum. Compl. ¶ 39(a).

**B. The Association did not breach by "entering into a contract with Blue Stream and not with Spectrum," ¶ 39(b).**

### 1. Section 2 did not create a right of first offer or a right of first refusal.

Spectrum's case turns on the interpretation of § 2, a provision entitled "Term; Right of First Offer/Refusal." A right of first offer is not the same thing as a right of first refusal. And the Agreement's text does not purport to create either one.

A right of first offer "requires the seller, upon deciding to market its property, to first make an offer to the grantee of the right of first offer." 92 Corpus Juris Secondum, Vendor and Purchaser § 177 (2024). "If the grantee does not accept that offer, the seller is then free to sell to anyone else on the terms rejected by the grantee or on terms that are better, but not worse, for the seller." *Id.* Here, the text imposes no requirement first to "offer" Spectrum the terms and conditions on which the Association would agree to purchase bulk services, before making an offer to other

14

providers (although the Association did approach Spectrum first, in 2018). *Compare* Agreement § 2, *with Comcast of Fla./Ga./Penn., L.P. v. Avalon Park Prop. Owners Ass'n, Inc.*, No. 6:12-cv-1671-Orl-31KRS, 2014 WL 92726, at *1 (M.D. Fla. Jan 9, 2014).

A right of first refusal, on the other hand, is "a right to elect to take specified property *at the same price* and *on the same terms and conditions* as those contained in a good faith offer by a third person if the owner manifests a willingness to accept the offer." *Old Port Cove Holdings, Inc. v. Old Port Cove Condo. Ass'n One, Inc.*, 986 So. 2d 1279, 1285 (Fla. 2008) (quoting *Pearson v. Fulton,* 497 So. 2d 898, 900 (Fla. 2d DCA 1986)) (italics added). "The right of first refusal ripens into an option once an owner manifests a willingness to accept a good faith offer." *Id.*

Nowhere does the text grant Spectrum a "right of first refusal" for the provision of bulk cable services on "the same" terms and conditions contained in a third party's offer. *Old Port Cove*, 986 So. 2d at 1285; *compare* Agreement § 2, *with Comcast*, 2014 WL 92726. Nor does the text say Spectrum has an "option" to provide bulk cable services on "the same" terms and conditions that the Association has manifest a willingness to accept. *Old Port Cove*, 986 So. 2d at 1285. As Florida cases make clear, a right of first refusal is only "properly exercised" where the "essential terms" are "identical." *Castelli v. Castelli*, 159 So. 3d 271, 274 (Fla. 4th DCA 2015); *Int'l Christian Fellowship, Inc. v. Vinh on Prop., Inc.*, 954 So. 2d 1214, 1215–16 (Fla. 4th DCA 2007); *Steinberg v. Sachs*, 837 So. 2d 503, 505  (Fla. 3d DCA 2003); *see also Keys Lobster, Inc. v. Ocean Divers, Inc.*, 468 So. 2d 360,   362–63 (Fla. 3d DCA 1985)

(exercise of right of first refusal bound holder to "the terms of the purchase agreement" offered by third party).

While the Agreement used language of a right "to match said offer"—"a term of art" meaning "the essential terms of the offers are identical"—the insertion of modifying (and contradictory) language allowing *different* terms and conditions took this provision well outside the realm of a right of first refusal. *Coastal Bay Golf Club, Inc. v. Holbein*, 231 So. 2d 854, 858 (Fla. 3d DCA 1970) (rejecting argument that "match said offer" meant "the equivalent of"); *cf. Comcast*, 2014 WL 92726 (provider rejected right of first refusal when, instead of accepting third party's offer, it "sent a counter-proposal that contained materially different terms"). Indeed, Spectrum could not arguably exercise an option, creating a "mutually binding and enforceable contract," *Keys Lobster*, 468 So. 2d at 362–63, if it bound the parties to *different* essential terms and conditions than those the Association had "manifest[] a willingness to accept." *Old Port Cove*, 986 So. 2d at 1285.

### 2. Section 2 granted Spectrum a right to receive offers the Association was willing to accept, and a period of time to submit a competing offer.

Rather than create a right of first refusal, § 2 gave Spectrum the right to receive notice of any third-party offer the Association was willing to accept, and time to submit its own offer with equivalent or better terms. These rights were "valuable" in and of themselves, Spectrum's corporate representative conceded. SOF ¶¶81-82.

After ranking the proposals, the subcommittee recommended Blue Stream and, then, fully negotiated the terms and conditions of a bulk contract with Blue

Stream. Without § 2, Spectrum never would have seen the proposed Blue Stream contract, never would have known the exact terms and conditions the Association was willing to accept, and never would have had the opportunity to tailor its terms and conditions in a competing offer. Section 2 gave Spectrum the last word, the right to make the final offer to the Association—a clear advantage over its competitors.

Although § 2 gave Spectrum these valuable rights, conspicuously absent is any right of Spectrum to, for instance, "*enter into an agreement* on equivalent or better terms." In fact, nothing required the Association to *accept* Spectrum's offer, no matter how good it may have been. "Where a contract is silent as to a particular matter, courts should not, under the guise of construction, impose on parties contractual rights and duties which they themselves omitted." *MedFirst Corp. v. Cmty. Health Plan of the Rockies, Inc.*, 143 F. App'x 146, 149 (11th Cir. 2005) (quoting *BMW of N. Am., Inc. v. Krathen*, 471 So. 2d 585, 587 (Fla. 4th DCA 1985)). This means "[a]n interpretation is not reasonable if it requires rewriting the contract to add language that a party omitted and in order to impose an obligation on the other party that was not in the original bargain." *John M. Floyd & Assocs., Inc. v. First Fla. Credit Union*, 443 F. App'x 396, 399 (11th Cir. 2011) (collecting Florida cases). Spectrum cannot unilaterally impose on the Association an obligation to accept its offer.

### 3. The terms and conditions in Spectrum's offer were neither "equivalent to" Blue Stream's nor "better" for the Association's needs.

Spectrum failed even to "match" Blue Stream's offer "on equivalent or better terms and conditions." Rather than adopt Blue Stream's terms and conditions—

17

which the Association had manifest a willingness to accept—or even redline revisions, Spectrum sent an entirely new contract. The differences were significant.

### (a) Differences related to the installation of fiber

To Solivita, "fiber to each home was an absolute." SOF ¶23. Yet, Spectrum's offer gave it "sole discretion" to decide if it was "commercially sensible to install the System," and required renegotiation—and potentially termination—if the parties could not "resolve such situation." SOF ¶104. This rendered the promise to install the System illusory, that is, "so insubstantial as to impose no obligation at all on the promisor—who says, in effect, 'I will if I want to.'" *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1311 (11th Cir. 1998) (quotations omitted) (contract illusory where party had "option—albeit tacitly—to renegotiate, at any time, the prices that it would charge … for performing cable system construction work"); *Rosenberg v. Lawrence*, 541 So. 2d 1204, 1206 (Fla. 3d DCA 1988) ("Where one party retains to itself the option of fulfilling or declining to fulfill its obligations under the contract, there is no valid contract and neither side may be bound.").

While Blue Stream tracked the RFP requirement for "fiber-to-the-home," Spectrum referenced only a "fiber-based" service. SOF ¶¶114-15. Blue Stream even agreed to penalties for not timely installing the fiber system, but Spectrum did not, further opening the possibility of Spectrum continuing to use the existing coax for an extended period of time, thinking Solivita "wouldn't have known the difference." SOF ¶¶54, 121-22. This remained a concern, given Dodson's resistance to fiber and his push for the significantly cheaper "high split." SOF ¶¶46, 50-51. Spectrum's

18

internal discussions that "[S]olivita does not make sense," and "this community doesn't really need a fiber overbuild," only validated that concern. SOF ¶72.

### (b) Differences in home equipment

Unlike Blue Stream, which gave equipment specifications, Spectrum followed its general "practice" of not agreeing to provide "specif[ic] equipment models" and leaving to its "sole discretion" the equipment it would provide. SOF ¶¶109-11. This created the very uncertainty the subcommittee sought to avoid. SOF ¶113. For instance, although fiber and coax use different modem types, Spectrum only agreed to provide "one modem," with no obligation to provide a specific type, whereas Blue Stream listed a specific type of modem that is only used with fiber. SOF ¶112.

Similarly, Blue Stream agreed to provide a TiVo set top box, an established product, with functionality to catchup on all programs aired within the last 72 hours. SOF ¶109, 117. Spectrum was not obligated to supply to a particular set top box, and although witnesses later testified Spectrum would have given a Xumo set top box, that "new streaming device" was not then in use anywhere and does not include catchup of all programs within the last 72 hours. SOF ¶59, 116- 117.

Blue Stream agreed to provide as many wireless mesh pods per unit as needed to stream 4k video in all air-conditioned spaces; Spectrum only obligated itself to provide a single mesh pod per unit. SOF ¶¶109-10.

While Blue Stream agreed to install residents' in-home equipment, Spectrum's offer required residents to "self-install" their in-home equipment, consistent with the "traditional customer experience [Solivita] has seen from Spectrum." SOF ¶118-119.

### (c) Differences in costs

Although Spectrum's offer tracked a portion of Blue Stream's rate provision, it removed the phrase "inclusive of all fees and surcharges." SOF ¶¶106-07. This would allow Spectrum to apply its "Broadcast TV Surcharge," something it adds "[o]n most" bulk services contracts. SOF ¶108.

### (d) Differences in the performance guarantee

Blue Stream guaranteed minimum service and performance levels and allowed termination if not corrected within 30 days. SOF ¶122(a). Spectrum tracked this provision—subject to an exclusion that said "NO MINIMUM TRANSMISSION SPEED, UP-TIME, OR AVAILABILITY IS GUARANTEED AT ANY TIME." SOF ¶122(b).

### (e) Additional obligations imposed on the Association

Unlike Blue Stream, Spectrum required the Association to send residents an annual notice of Spectrum's Residential Voice Services Agreement, their obligation to comply, and warn that the failure to do so may result in disconnection. SOF ¶122(c). And Spectrum would have obligated the Association to pay its attorney's fees and expert fees, if Spectrum were to prevail in a legal dispute. SOF ¶122(d).

* * *

In exercising a right of first refusal, "the terms are always dictated by the third party whose offer the holder of the right of first refusal is bound to match *in all essential details.*" *Steinberg*, 837 So. 2d at 505 (italics added). Spectrum's offer was neither "equivalent to" nor "better" than Blue Stream's in these "essential," "material" terms—all of which the Association had manifest a willingness to accept.

*See, e.g., Comcast*, 2014 WL 92726 at *3 & n.5 (finding "materially different terms" included, among others: "Bright House agreed to provide wireless internet access, while Comcast only agreed to good faith attempts to provide wireless internet access;" "Bright House agreed to provide certain equipment and cable outlets for no charge while Comcast failed to include matching provisions;" and "Comcast included a refund provision[] for early termination while Bright House did not"); *Int'l Christian*, 954 So. 2d at 1216 (finding unmatched "essential" offer terms included "closing date, financing, and [seller's] duty to repair the property"). So by submitting "materially different terms," Spectrum presented a "counter-proposal," which "constituted a rejection of the [Blue Stream] proposal" and any right of first refusal Spectrum claims to have had under the Agreement. *Comcast*, 2014 WL 92726 at *3.

### C. Spectrum has no claim of breach for "[e]ntering into a contract with Blue Stream on terms and conditions different than" the one it received, ¶ 39(c).

Spectrum appears to assert the Association breached § 2 by forwarding the draft contract it received from Blue Stream without replacing placeholder pages that identified three attachments. Spectrum suggests this deprived it of the opportunity to match a "revised offer," apparently to the extent the attachments amounted to a revision of the draft contract. Compl. ¶¶ 31, 39(c).

The attachments did not create a "revised" offer. The draft Blue Stream agreement specified the contract itself would prevail in the event the attachments created any inconsistency or conflict. SOF ¶80. Of course, Spectrum never requested the attachments, despite being listed on placeholder pages, when compiling its

21

counter-proposal. SOF ¶87. And it already had two of the three. SOF ¶88. The only document Spectrum lacked consisted of Blue Stream's RFP response, which was later negotiated and revised into the draft contract itself.

But more significantly, Spectrum's offer failed to match the essential terms and conditions that appeared on the face of the draft Blue Stream contract the Association forwarded to Spectrum, as discussed in the previous section. Having failed to match those essential terms, Spectrum cannot complain that it lacked the opportunity to match other additional terms and conditions from attachments that it never requested.

**D. There was no breach of the duty of good faith and fair dealing, ¶ 39(d).**

The "duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." *Endurance Am. Specialty Ins. Co. v. Liberty Mut. Ins. Co.*, 34 F.4th 978, 988 (11th Cir. 2022) (quotation omitted); *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 548 (Fla. 2012) (quotation omitted). In other words, the implied covenant must "attach to the performance of a specific contractual obligation." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001) (cleaned up) (quoting *Johnson Enters.*, 162 F.3d at 1314).

Here, the Association did just what the Agreement required—it gave written notice of Blue Stream's offer and allowed Spectrum time to match. Spectrum suggests the Association had to provide a "sincere opportunity" and "reasonably

determin[e]" whether it had proposed equivalent or better terms and conditions. That's not what the Agreement says (although the Association did both of those things). Spectrum has not "attache[d]" its good faith and fair dealing claim to any contractual term the Association was obligated to perform, *Ford*, 260 F.3d at 1291, and it cannot establish "any express term … has been violated." *Endurance*, 34 F.4th at 988.

In drafting the Agreement, Bright House could have attempted to curb the Association's ability to choose a new cable provider. But it failed to include any language that removed, or even limited, the Association's judgment in deciding which new provider to select. *Cf. Ford*, 260 F.3d at 1291 ("Under the Dealership Agreement, it is Appellee's *own* judgment that controls, not EHF's judgment, not a jury's judgment and not a reasonable business person's judgment.… This clear and unambiguous provision cannot be interpreted as opening the door for a jury to second-guess Appellee's judgment or as setting limits on Appellee's reasons for making a relocation determination." (cleaned up)).

Even if the Agreement had contained a term specifying the Association would use its "best judgment" or "sole discretion" to determine whether Spectrum had proposed equivalent or better terms and conditions, Spectrum's claims would still fail. The "limit" the duty of good faith and fair dealing "place[s] on a party's discretion is not great." *Ford*, 260 F.3d at 1291. Even "an honest mistake, bad judgment or negligence" will not suffice. *Resnick v. Avmed, Inc.*, 693 F.3d 1317, 1329 (11th Cir. 2012) (quoting *Tiara Condo. Ass' n, Inc. v. Marsh & McLennan Cos., Inc.*, 607

F.3d 742, 747 (11th Cir. 2010)). Rather, there must be "a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party." *Id.* The exercise of discretion must be "capricious" or "arbitrary"; it must be a decision that "no reasonable party in [that] position … would have made…" *Ford*, 260 F.3d at 1291–92; *Publix Super Markets, Inc. v. Wilder Corp. of Del.*, 876 So. 2d 652, 655 (Fla. 2d DCA 2004).

And it must frustrate the parties' "reasonable expectations" surrounding the contract's "central purpose." *Ford*, 260 F.3d at 1291 (no breach of good faith and fair dealing in denying request to relocate dealership where "the central purpose of the Dealership Agreement was to sell cars, not to relocate the dealership"); *Burger King Corp. v. Ashland Equities, Inc.*, 217 F. Supp. 2d 1266, 2379 (S.D. Fla. 2002) (no breach of good faith and fair dealing in denying request to approve transfer of restaurant where the "central purpose of the Franchise Agreement was to sell food … not the transfer of the restaurants"), *aff'd*, 103 F. App'x 666 (11th Cir. 2004).

The selection of a new cable provider may not have been in Spectrum's financial interests. But Spectrum has no evidence of an arbitrary or capricious exercise of discretion, or a conscious and deliberate decision to frustrate the purpose of the contract, much less its "central purpose" of supplying bulk cable services during the 10-year term from 2014 to 2024—not selecting the next provider. *See id.*

## II. Spectrum cannot establish its claim for specific performance in Count II

Spectrum is not entitled to a judgment "that the Spectrum Offer be accepted by the Association and the new contract be awarded to Spectrum." Prayer for Relief.

To start, Spectrum cannot show the lack of an adequate remedy at law, particularly in light of its damages claim in Count I. *See DiMauro v. Martin*, 359 So. 3d 3, 9 (Fla. 4th DCA 2023). Nor can Spectrum show a breach of any provision in the Agreement that would support its request for specific performance, for all the reasons discussed above.

## Conclusion

The undisputed facts show that Spectrum cannot prevail on its claims for breach of contract in subparagraphs 39(a)–(d) of the complaint or on its claim for specific performance.[1] The Association is entitled to partial summary judgment.

---

[1] Subparagraphs 39(e)–(f) allege breaches of a confidentiality provision and an indemnity obligation related to small cable repairs. These minor, insignificant claims are not the subject of this motion.

Respectfully submitted,

Dated: June 27, 2024     By:    */s/ Bryan D. Hull*
                          J. Carter Andersen (Fla. Bar. No. 0143626)
                          Bryan D. Hull (Fla. Bar No. 20969)
                          Howell Web Melton, III (Fla. Bar No. 37703)
                          BUSH ROSS, P.A.
                          1801 N. Highland Avenue
                          Tampa, FL  33602-2656
                          (813) 224-9255
                          candersen@bushross.com
                          bhull@bushross.com
                          wmelton@bushross.com
                          *Counsel for Solivita Community Association, Inc.*

### Certificate of Service

I certify that on June 27, 2024, all counsel of record are being served with the foregoing via CM/ECF system.

                          */s/ Bryan D. Hull*